**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSSETS**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* | ) | |
| HITROST LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 21-CV-10274-ADB |
| | ) | |
| STUDY ACROSS THE POND, LLC and | ) | **DEMAND FOR JURY TRIAL** |
| JOHN BORHAUG, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**<u>UNITED STATES OF AMERICA'S COMPLAINT IN PARTIAL INTERVENTION</u>**

The United States of America, by and through its undersigned counsel, brings this Complaint in Partial Intervention against Study Across the Pond, LLC and John Borhaug to recover damages, civil penalties, and costs under the False Claims Act, 31 U.S.C. §§ 3729-3733, or in the alternative, to recover damages and other monetary relief under the common law and equitable theory of unjust enrichment. Pursuant to 31 U.S.C. § 3730(b)(4)(A), the United States intervenes in this action against some but not all of the defendants named by the relator, Hitrost LLC, and alleges the following.

**INTRODUCTION**

1. Since 2004, Study Across the Pond, LLC, (Study Across the Pond or the Company) at the direction with the assent of John Borhaug (collectively the Defendants), has recruited students from the United States to attend colleges and universities in the United Kingdom. Many of those students used federal student aid to pay for their education.

2. Title IV of the Higher Education Act of 1965 governs the administration of

federal student aid programs and prohibits participating schools from paying incentive compensation to recruiters like the Defendants.  Knowing that, the Defendants still demanded that foreign schools participating in federal student aid programs pay them incentive compensation for their recruiting services.  The Defendants encouraged foreign schools to make false statements to the United States Department of Education (Department of Education) and hide their incentive compensation payments by executing sham contracts and withholding information from independent auditors.  The Department of Education relied on the schools' false statements when deciding to allow them to participate in federal student aid programs and when deciding to pay their claims for tens of millions of dollars in federal student aid.

3.      Since at least January 1, 2015, the Defendants have received at least tens of thousands of dollars in incentive compensation for recruiting American students, and knowingly caused foreign schools to submit numerous claims for payment to federal student aid programs that were based upon false records and false statements, in violation of the False Claims Act and common law.

## JURISDICTION AND VENUE

4.      The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 (federal question) and 1345 (United States as plaintiff).

5.      At all times relevant to this Complaint, Study Across the Pond was domiciled and transacted business in this judicial district, including the acts proscribed by 31 U.S.C. § 3729. Upon information and belief, John Borhaug has resided and transacted business in this judicial district since 2020, including the acts proscribed by 31 U.S.C. § 3729.  Accordingly, venue is proper in this district pursuant to 28 U.S.C. §§ 1391 and 1395(a) and 31 U.S.C. § 3732(a).

**PARTIES**

6. Plaintiff United States of America, on behalf of the Department of Education, which is an agency of the United States, has intervened in this action as to defendants Study Across the Pond and John Borhaug, ECF No. 36, and brings this Complaint in Partial Intervention pursuant to 31 U.S.C. § 3730(b)(4)(A).

7. The relator, Hitrost LLC, is a limited liability company organized under the laws of Delaware. The company's principal was employed as the lead North American student recruiter for a school that used the Defendants' recruiting services.

8. The defendant John Borhaug is a natural person last known to reside at 4 Melville Court in Lenox, Massachusetts. In addition to being a member and co-founder of Study Across the Pond, John Borhaug serves as the Chief Executive Officer of the Company.

9. The defendant Study Across the Pond is a limited liability company organized under the laws of Massachusetts with its principal place of business in Beverly, Massachusetts. The Company's members are its co-founders, John Borhaug and his partner, Hannah Liscombe. The Company does business in the United Kingdom under the name Across the Pond Study in Britain Ltd.

10. On January 29, 2024, defendant Study Across the Pond filed a Certificate of Cancellation with the Secretary of the Commonwealth of Massachusetts, citing the termination of business operations as the reason for cancellation.

**DEFENDANTS' CLIENTS**

11. The Defendants provided student recruitment services to numerous colleges and universities in the United Kingdom.

12. A subset of those schools (collectively the Defendants' Clients or Clients)

3

participated in federal student aid programs under Title IV of the Higher Education Act, and presented at least one claim for payment from those programs to the Department of Education between January 1, 2015, and the present.

13. The Defendants' Clients are all domiciled in the United Kingdom.

14. Individually the Defendants Clients are: Aberystwyth University, Bangor University, University of Brighton, Cardiff University, University of Chester, University of East Anglia, Edinburgh Napier University, University of Essex, University of Exeter, University of Greenwich, University of Hertfordshire, University of Kent, Kingston University, University of Lancaster, University of Leeds, University of Leicester, University of Lincoln, University of Liverpool, Loughborough University, Oxford Brookes University, University of Reading, University of Sheffield, University of Southampton, University of Stirling, University of Strathclyde, Swansea University, University of Winchester, and University of York.

### INCENTIVE COMPENSATION BAN

15. Title IV of the Higher Education Act of 1965, 20 U.S.C. §§ 1070-1099c-2, established several loan and grant programs to assist eligible students with offsetting the costs of higher education.

16. In the late 1980s and early 1990s, the Senate's Permanent Subcommittee on Investigations opened an investigation in response to dramatic increases in the number of guaranteed student loans issued under Title IV programs as well as the number of students defaulting on such loans. At the time, both the Government Accountability Office (GAO) and the Office of Management and Budget identified federal student loan programs as "high risk" government efforts vulnerable to waste, fraud, and abuse. After a year-long investigation, the subcommittee determined that unethical admissions and recruitment practices, among other

4

things, were undermining the integrity of the federal student financial aid programs. *See Abuses in Federal Student Aid Programs*, S. Rep. No. 58, 102d Cong., 1st Sess., at 1-2, 8 (1991). A year later, when Congress amended and extended the Higher Education Act, it included a new prohibition on the use of commission sales persons and recruiters. H.R. Rep. No. 102-447, at 10, 1992 U.S.C.C.A.N. 334, at 343.

17.	A school's participation in federal student aid programs is now conditioned upon the school's agreement that it—

> "will not provide any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the award of student financial assistance. . . ."

20 U.S.C. § 1094(a)(20); *see also* 34 C.F.R. § 668.14(b)(22) (implementing regulations). This is referred to as the Incentive Compensation Ban.

18.	To assist schools in complying with the Incentive Compensation Ban and other rules governing Title IV programs, the Department of Education publishes updates and guidance in the form of Dear Colleague Letters, Electronic Announcements, and Federal Register notices.

19.	On March 17, 2011, the Department of Education published a Dear Colleague letter discussing trends the Department had observed among stakeholders. Letter GEN-11-05, *Implementation of Program Integrity Regulations,* at 8-14, available online at: https://fsapartners.ed.gov/sites/default/files/attachments/dpcletters/GEN1105.pdf.

20.	One such trend was the practice of "tuition sharing," in which third parties charged schools a percentage of recruited students' tuition as a way of assuming the business risk associated with student recruitment. These third parties typically combined student recruitment services with a bundle of other services not covered by the Incentive Compensation Ban, such as course support for online delivery of courses, the provision of technology, and student career

5

counseling, among other things. *See id.* at 12 (providing examples).

21.    The Department of Education advised that tuition sharing is generally a prohibited form of compensation; however, when tuition sharing compensates a third party for a bundle of services—not just recruitment—then tuition sharing does not inappropriately incentivize student enrollment. *See id.* at 11. The Department of Education refers to these third parties as Bundled Services Providers.

22.    The Dear Colleague letter established an exception to its view of tuition sharing as a violation of the Incentive Compensation Ban for Bundled Services Providers. The letter explained that when an unaffiliated student recruiter provides a "bundle of services" to a school—not just recruitment services but also marketing, enrollment application assistance, course support for online delivery of courses, the provision of technology, placement services for internships, and student career counseling—then tuition sharing is allowed as long as: (a) "the [recruiter] does not make prohibited compensation payments to its [own] employees" and  (b) "the school does not pay the [recruiter] separately for student recruitment services." *Id.,* Example 2-B, at 12 (emphasis added).

## FEDERAL DIRECT LOAN PROGRAM

23.    Colleges and universities located outside the United States, as described in 34 C.F.R. § 600.52 (foreign institutions), may apply to participate in the Federal Direct Loan Program.

24.    The Federal Direct Loan Program (Direct Loan Program) is a federal student aid program under which eligible students at participating schools and their parents can borrow money directly from the Department of Education. The types of loans currently available through the Direct Loan Program are: Direct Subsidized Loans, Direct Unsubsidized Loans,

6

Direct PLUS Loans, and Direct Consolidation Loans.

25.     To participate in the Direct Loan Program, foreign schools must first apply to and receive approval from the Department of Education.

26.     If the Department of Education determines that a foreign school may be eligible to participate in the Direct Loan Program, then the foreign school must also agree to comply with the law governing federal student aid programs.  The school memorializes its agreement by executing a Program Participation Agreement (PPA) with the Department of Education.  20 U.S.C. § 1094(a); 34 C.F.R. § 668.14(a)(1).

27.     The PPA expressly conditions a foreign school's initial and continuing participation in the Direct Loan Program on the school's compliance with specific statutory and regulatory requirements, including the Incentive Compensation Ban.  20 U.S.C. § 1094(a)(20).

28.     In executing the PPA, the foreign school agrees that its participation in the Direct Loan Program is subject to the terms and conditions set forth in the PPA, including that the school is subject to and will comply with the program statutes and implementing regulations for institutional eligibility set forth in 34 C.F.R. Part 600, and for the Direct Loan Program, as well as the general provisions set forth in Part F and Part G of Title IV of the Higher Education Act, and the Student Assistance General Provisions regulations set forth in 34 C.F.R. Part 668.

29.     Specifically, the foreign school states that it will not provide any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the award of federal student aid.

30.     The Department of Education uses the information provided in the school's application and the statements made in the school's PPA to determine whether or not the school

(a) is eligible to participate in the Direct Loan Program and (b) should be allowed to participate. By countersigning the PPA, the Department agrees that the school is allowed to participate in federal student aid programs for a limited time subject to the terms and conditions of the PPA.

31.     The Department of Education certifies schools to participate in federal student aid programs, including the Direct Loan Program, for up to six years at a time.

32.     Recertification is the process through which a school that has been certified previously to participate in federal student aid programs, including the Direct Loan Program, applies to have its participation extended.  The school must submit a materially complete application for recertification to the Department of Education before its current PPA expires.

33.     The Department of Education then determines whether or not the school (a) continues to meet the requirements of 34 C.F.R. Parts 660 and 668 and (b) should be allowed to continue participating in the Direct Loan Program.  34 C.F.R. § 600.20(b)(2)(i).

**COMPLIANCE AUDITS**

34.     In addition to executing and renewing their PPAs, most participating schools must have an independent public accountant or a government auditor conduct regular audits of (a) their compliance with the laws and regulations governing the federal student aid programs in which they participate and (b) their financial statements.  20 U.S.C. § 1094(c)(l)(A); 34 C.F.R. § 668.23(a)(2), (a)(4).

35.     The Department of Education has waived the requirement to provide audited financial statements for most foreign schools; however, foreign schools must still have a compliance audit performed and report the results to the Department of Education.  34 C.F.R. § 668.23(h).

36.     These compliance audits must be done in accordance with the Generally Accepted

Government Auditing Standards (GAGAS).

37.     In addition to those standards, the Inspector General for the Department of Education publishes guidance to assist independent auditors in designing and executing these compliance audits for foreign schools.  *See Guide for Financial Statement Audits and Compliance Attestation Engagements of Foreign Schools* (March 2020), available online at https://oig.ed.gov/sites/default/files/document/2023-03/foreign-school-audit-guide_2020.pdf.

38.     Independent auditors who perform these compliance audits examine and rely upon a foreign school's records and attestations to determine whether the school complies with the requirements to participate in federal student aid programs.

39.     Beginning with the fiscal year ending December 31, 2020, independent auditors were required to test foreign schools' compliance with the Incentive Compensation Ban.

**CLAIMS FOR PAYMENT**

40.     When a student enrolled at a foreign school is awarded Direct Loan Program funds, the foreign school submits origination and actual disbursement information for the student's loan to the Department of Education using the Common Origination and Disbursement (COD) system.

41.     The COD system is designed to support origination, disbursement, and reporting for the Direct Loan Program and other federal student aid programs.

42.     After origination and actual disbursement information is submitted and accepted via the COD system, funds are made available to the foreign school through the Department of Education's G5 website.

43.     G5 is a web-based system that keeps track of the availability, drawdown, and refund of Direct Loan funds.  G5 is not a student-level system.  It does not track individual

Direct Loans or the funds an individual student or parent receives. That is done by the COD system, which operates in conjunction with G5.

44.    The foreign school draws down the amounts awarded to its students through the G5 website, and then the school disburses these funds to each student's account or directly to the student or parent. Prior to completing the draw down of funds through the G5 website, the foreign school must agree with this statement: "I certify, by processing this payment request and/or re-allocation, that the funds are being expended within three days of receipt for the purpose and condition of the agreement."

45.    Consequently, the foreign school's claim for payment is a two-step process. First, the school submits student-specific origination and disbursement information to the Department of Education through the COD system. Second, the school draws down the federal funds through the G5 system.

46.    The foreign school then disburses the Direct Loan Program funds for the benefit of its eligible American students.

**FALSE CLAIMS ACT**

47.    The False Claims Act provides, in part, that any person who individually, or in concert with others, knowingly presents, or causes to be presented, a false claim for payment or approval, or makes, uses, or causes to be made or used a false statement that is material to a claim for payment or approval, is liable to the United States for penalties and treble damages. *See* 31 U.S.C. §§ 3729(a)(1)(A)-(C).

48.    "Knowingly" means that the person: (1) had actual knowledge of the information; (2) acted in deliberate ignorance of the truth or falsity of the information; or (3) acted in reckless disregard of the truth or falsity of the information. A person need not have acted with specific

10

intent to defraud the United States to be liable under the False Claims Act.  *See* 31 U.S.C. §§ 3729(b)(1).

49.     A "claim" includes "any request or demand, whether under a contract or otherwise, for money or property. . .that is presented to an officer, employee, or agent of the United States."  31 U.S.C. § 3729(b)(2)(A)(i).

50.     "Material" means "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."  31 U.S.C. § 3729(b)(4).

## THE DEFENDANTS' MISCONDUCT

51.     As explained below, the Defendants knowingly caused their Clients to make or use materially false statements and submit materially false claims to the Department of Education.  The Defendants demanded that their Clients compensate them for recruitment services with tuition sharing, even though the Defendants did not qualify as Bundled Services Providers.  For years, they knew of the Incentive Compensation Ban and advised their Clients not only to violate the Ban but also to hide their violations from the Department of Education. The Defendants caused their Clients to make false statements and submit false claims to the Department of Education, which were material to the Department's payment decisions.

## I.    The Defendants Solicited and Received Compensation Based on Student Enrollments

52.     At the direction and with the assent of defendant John Borhaug, defendant Study Across the Pond solicited and received compensation for its recruitment services in the form of commissions from foreign schools, including the Defendants' Clients.

53.     The Company's commissions were a percentage of the tuition paid by students the Company had successfully recruited for its Client.  At various times between January 1, 2015, and the present, these included American students who received Direct Loan Program funding to

help them pay the tuition and costs charged by the foreign schools.

54.     In addition to base commissions, some of the Defendants' Clients paid enhanced commissions if the Defendants exceeded agreed upon recruitment targets, or "progression" commissions, which allowed the Defendants to claim a share of the tuition paid by recruited students who progressed to a second year or enrolled in a second degree program with the school.

55.     For example, effective beginning on January 25, 2021, the University of Liverpool agreed to pay defendant Study Across the Pond commissions for student recruitment services as follows—

    a.     10 percent of the fees paid by a recruited student for pre-sessional English Language courses, study abroad programs, fee-paying postgraduate research programs;

    b.     for the first thirty students recruited during the cycle, 12.5 percent of each student's first year tuition fees, excluding bench fees, for programs lasting at least one academic year; and

    c.     for any additional recruited students, 15 percent of each student's first year tuition fees, excluding bench fees, for programs lasting at least one academic year.

56.     This agreement covered the recruitment of students residing in the United States.

57.     Pursuant to this agreement, the University of Liverpool paid defendant Study Across the Pond a percentage of the tuition paid by American students the Company recruited, including students who received loans through the Direct Loan Program.

## II.     The Defendants Did Not Qualify as Bundled Services Providers

58.     At all times relevant, Study Across the Pond, at the direction and with the assent of John Borhaug, (a) paid incentive compensation to its own employees and (b) was paid by its

12

Clients for student recruitment services separately from any other services. Consequently, the Company did not qualify as a Bundled Services Provider.

**A.    The Defendants Paid Incentive Compensation to Their Employees**

59.    The Defendants paid their student-facing employees and contractors, known as Student Advisors, incentive compensation based on the number of students they recruited.

60.    The primary responsibility of the Student Advisors was to help as many students as possible from a defined geographic area apply to foreign schools that had compensation agreements with defendant Study Across the Pond (referred to as "partner schools"), with the ultimate aim of increasing enrollment at those schools.

61.    At the direction and with the assent of defendant John Borhaug, defendant Study Across the Pond paid its Student Advisors a base salary plus commission or bonus payments. The "applicant commission" was based on the number of students who applied to a foreign school with the advisor's assistance. The "conversion commission" was based on the number of those students who ultimately enrolled in partner schools.

62.    For example, for the year beginning September 1, 2020, in a document printed on Company letterhead, an employee of defendant Study Across the Pond offered to pay a Senior Student Advisor an applicant commission of $50 per student for each student after the fiftieth that the advisor assisted in successfully applying. During prime application season, this commission increased to $65 per student for each student after the fiftieth. The advisor could also earn a conversion commission of $1,500 when 48 percent or more of the advisor's applicants registered and paid their tuition fee to a partner school.

63.    At the direction and with the assent of defendant John Borhaug, defendant Study Across the Pond imposed quotas on its Student Advisors, that is, a minimum number of students

the advisors were expected to assist with applications in a given season.  To help Student Advisors meet their quotas, the Defendants circulated reports showing how many students each advisor helped to apply each month.

64.    To be eligible for a conversion commission, Student Advisors had to first meet the minimum required number of sent applications for the cycle.

65.    At the direction and with the assent of defendant John Borhaug, defendant Study Across the Pond issued warnings to Student Advisors whose recruited student numbers were low and pressured those Student Advisors to recruit more students.

66.    Failing to meet the stated recruitment targets was grounds for termination of a Student Advisor.  Conversely, meeting or exceeding the targets resulted in bonuses and promotions.

**B.    The Defendants Were Paid Separately for Recruitment Services**

67.    The Defendants solicited and received compensation from foreign schools, including the Defendants' Clients, for marketing and other services separately from their commissions for recruiting services.

68.    Defendant Study Across the Pond routinely charged its Clients an "annual representation fee," which covered marketing benefits like featuring the school on the Company's website or in its printed marketing brochures.

69.    Defendant Study Across the Pond also charged separate, one-time fees for running digital marketing campaigns on behalf of foreign schools, including the Defendants' Clients.

70.    Defendant Study Across the Pond also charged separate, one-time fees and travel expenses for promoting foreign schools, including the Defendants' Clients, at college fairs or

14

recruitment events.

71.    The Company, at the direction and with the assent of John Borhaug, invoiced its Clients for these services separately from recruitment services, and its Clients paid those invoices accordingly.

72.    For example, in 2018, defendant Study Across the Pond issued separate marketing and recruitment invoices to the University of Southampton as summarized below.  The university then paid these invoices in the amounts shown below.

| INVOICE NUMBER | INVOICE DATE | DESCRIPTION | AMOUNT (USD) | AMOUNT (GBP) |
|---|---|---|---|---|
| 14423 | Feb. 26, 2018 | Commission 2017-2018 | $22,075.98 | £16,086.85 |
| 14473 | June 5, 2018 | Annual Representation Fee – USA | $1,978.20 | £1,500.00 |
| | | Annual Representation Fee – Canada | $989.10 | £750.00 |
| | | Annual Representation Fee – CLFA | $3,956.40 | £3,000.00 |
| 14474 | July 5, 2018 | Annual Representation Fee – Latin America | $1,618.75 | £1,250.00 |
| 14486 | July 5, 2018 | Digital Marketing | $3,956.40 | £3,000.00 |
| 14490 | July 9, 2019 | Participation in 2018 Canada Law from Abroad Week | $787.38 | £600.87 |

73.    Invoice 14423 above demanded commission equal to a percentage of the tuition paid by the students the Defendants recruited to the University of Southampton, including American students who received federal student aid, during the 2017-2018 school year.

74.    Invoices 14473, 14474, and 14486 above demanded flat fees for generalized, annual marketing benefits in each of the Company's recruitment territories and a one-time digital marketing campaign on behalf of the University of Southampton, respectively.

75.    Invoice 14490 above demanded a fee plus travel expenses incurred when an employee of the Company represented the University of Southampton at a recruitment event.

**C.    Incentive Compensation Drove the Defendants' Advice to Students**

76.    These incentive compensation payments—between the Company and its Clients and between the Company and its employees—drove the advice the Defendants gave to students and incentivized enrollment.

77.    At the direction and with the assent of defendant John Borhaug, defendant Study Across the Pond directed Student Advisors to steer students to partner schools, including the Defendants' Clients, whenever possible.

78.    Defendant John Borhaug and other managers of defendant Study Across the Pond told Student Advisors that the Company would not be paid by a partner school until students recruited by the Company paid tuition and started attending classes.

79.    In furtherance of that goal, the Company's internal training documents profiled students into categories based on whether or not they were likely to "convert," meaning whether they were likely to go from applicants to enrollees.

80.    At the direction and with the assent of defendant John Borhaug, defendant Study Across the Pond directed Student Advisors to focus their attention on the students most likely to convert.

81.    The Defendants did not disclose to students that they and the Company's Student Advisors would profit from increasing applications and enrollments at partner schools, including the Defendants' Clients, or that they would receive a share of the tuition ultimately paid by recruited students.

**III.    The Defendants Knowingly Caused Violations of the Ban on Incentive Compensation**

82.    As early as 2013, the Defendants knew of the Incentive Compensation Ban and the Department of Education's guidance on prohibited compensation models.

16

83.    The Defendants also knew that the Department of Education published updates and guidance to assist schools in complying with the Incentive Compensation Ban and other rules governing Title IV programs.

### A.    The Defendants Advised Their Clients That the Ban Did Not Apply to Them

84.    Despite knowing of the Incentive Compensation Ban, the Defendants advised their Clients that the Ban did not apply to their situation, and to continue making incentive payments to the Defendants.

85.    For example, in 2013, the University of Exeter specifically asked an employee of defendant Study Across the Pond if it was "illegal for us to pay commission on any US student in receipt of a US federal loan[.]"

86.    Copying defendant John Borhaug, the employee responded that this rule did not apply to Study Across the Pond.  Nevertheless, the employee offered to convert the Company's existing commission contract with the University of Exeter to a flat fee contract, so long as the purported flat fee was "the equivalent of what commission would have been."  Defendant John Borhaug also responded and affirmed this offer.

87.    On this and other occasions throughout the relevant time period, the Defendants' Clients asked the Defendants whether or not the Incentive Compensation Ban applied to their tuition-sharing recruitment agreements with the Defendants.

88.    The Defendants consistently advised foreign schools, including the Defendants' Clients, that their activities were not subject to the Incentive Compensation Ban.

### B.    The Defendants Executed Sham Contracts with Their Clients

89.    Despite the Defendants' advice, some universities expressed reservations about paying defendant Study Across the Pond incentive compensation for recruitment services in

apparent violation of the Incentive Compensation Ban.

90.     The Defendants recommended that those foreign schools, including the Defendants' Clients, create sham contracts to hide their tuition sharing agreements with defendant Study Across the Pond. The Defendants then executed these sham contracts with their Clients.

91.     For example, in January 2021, the University of Southampton emailed an employee at defendant Study Across the Pond a link to the recently revised foreign schools audit guide published by the Inspector General of the Department of Education. The university specifically pointed out to the Company's employee, "[t]he relevant section is C.1.6. (Bonuses, Commissions, and Other Incentive Payments)."

92.     In response, the employee suggested that the University of Southampton "play it safe and have a general marketing and promotional arrangement and an annual fee instead of commission [contract]. . .and the annual fee happens to be the equivalent of 'commission' on any students on the lists who actually enrolled. In practical terms as long as we (university and ATP) understand how the annual amount is calculated then that's all that matters, since it won't be written into a contract of any kind."

93.     The employee then forwarded the University of Southampton's email and the linked document to defendant John Borhaug and another employee, and asked Mr. Borhaug if the Company should seek legal advice. The employee told Mr. Borhaug that the incentive compensation issue "certainly has potential to 'explode' if someone did end up getting pulled up for their relationship with us. It could I guess only need one university to get into sticky water on this. . . .and you know how they are. . . .like sheep."

94.     Defendant John Borhaug responded that he did not think there was "anything

really new" in the revised audit guide.  He then told the employee, "if they are audited and we come up, if somebody WANTS to make a problem, it will be a problem (but still ought to be fine), if they aren't looking to make one, it won't be.  At the end of the day, they have the list/document of what is permitted right there in the text – if they are concerned, put that wording in the contract, and then why wouldn't it be fine?"

95.    At the direction and with the assent of defendant John Borhaug, defendant Study Across the Pond also provided foreign schools, including some of the Defendants' Clients, with templates to help them draft sham contracts.

96.    These templates stated that defendant Study Across the Pond would be paid a flat fee irrespective of the number of students the Company recruited for the foreign school.

97.    However, in reality, the Defendants continued to solicit and receive incentive compensation from those schools, including the Defendants' Clients, for recruitment services, namely, a commission equal to a percentage of the tuition paid by the students the Defendants recruited.

98.    For example, the University of Southampton entered into a contract with defendant Study Across the Pond, executed by defendant John Borhaug, in which the school agreed to pay the Company "a fee which amount should be determined on an annual basis (GDP)…regardless of the number of students who enroll at UOS as a result of [the Company's] services."  The contract was effective for five years beginning on February 15, 2016.

99.    John Borhaug instructed an employee of Study Across the Pond who negotiated this contract with the school, "to clarify that they understand and agree … we are going to work to a 2000 GBP student measure for this year, but that this would have to increase by 150 pounds each year, or increase by an equivalent sum to tuition increases each time tuition fees are

increased. (this doesn't get put in writing, it is just understood/agreed verbally)."

100. As described above, despite the wording of this contract, the Defendants continued to solicit and receive commission from the University of Southampton equal to a percentage of the tuition paid by the students the Defendants recruited, including American students who received Direct Loan Program funds.

**C.    The Defendants Helped Their Clients Hide Incentive Compensation from the Department of Education**

101. The advice and assistance described above, including the execution of sham contracts, helped foreign schools, including the Defendants' Clients, hide from the Department of Education the payments of incentive compensation that the foreign schools made to Defendants.

102. For example, effective beginning on February 1, 2019, Bangor University agreed to pay commission to defendant Study Across the Pond for recruiting students, including students from the United States, as follows—

a.    for students that enrolled in an English Language Program at the University's English Language Centre and paid the tuition fees in full, commission of 20% of the tuition fee for the first five students and 25% for any additional students; and

b.    for students that enrolled in a standard program and paid the tuition fees, commissions as follows—

| STUDENT NUMBER | PERCENTAGE COMMISSION RATE |
|---|---|
| 1-10 | 20% |
| 11-15 | 25% |
| 16-20 | 25% |
| 21-25 | 30% |
| 26+ | 30% |
| September 2019 and January 2020 bonus | £500 |

103.   In early 2020, Bangor University contacted an employee of defendant Study Across the Pond for guidance on how to pay the Company its commission for American students who received awards from the Direct Loan Program.  The university asked, "whether we can consider putting a 'Marketing Agreement' in place for the US in case of audit by [the Department of Education]."  The employee responded that other schools were paying an annual "marketing fee" in an amount equivalent to a commission based on tuition sharing and directed the university to a template for this type of agreement that the Defendants had previously provided.

104.   Later that year, Bangor University entered into a new agreement with Across the Pond Study in Britain Ltd.  This agreement covered only students recruited from the United States and purported to pay a flat fee of £15,500 for one year of services.  The agreement also stated that no commission or other compensation would be payable outside of this flat fee.

105.   In the same year, Bangor University and Across the Pond Study in Britain Ltd. formally amended their 2019 commission agreement to exclude students from the United States.

106.   An employee of defendant Study Across the Pond wrote to defendant John Borhaug to notify him of this change and request his approval.  The employee told Mr. Borhaug, "[b]asically they are just literally moving what's owed as commission equivalency for the

Americans, after all calculations are made, and paying it as a marketing fee…." Defendant John Borhaug responded, "Yes, that would work."

107. Despite the changes in its contracts, the Defendants continued to solicit and receive from Bangor University a percentage of the tuition paid by the students the Defendants recruited, including American students who received Direct Loan Program funds.

108. In March 2022, as part of the university's re-certification application and review, an employee of Bangor University proposed to send the Department of Education copies of (a) the original 2019 tuition sharing contract, (b) the amended 2019 contract that excluded U.S. students, and (c) the 2020 "flat fee" contract that covered only U.S. students. Bangor University's Head of International Recruitment told that employee not to send the Department the original 2019 tuition-sharing contract with defendant Study Across the Pond.

109. Bangor University did not provide a copy of the 2019 tuition sharing contract to the Department of Education during its re-certification review, effectively hiding its incentive compensation arrangement with the Defendants from the Department of Education.

**D.    The Defendants Helped Their Clients Make False Statements to or Withhold Information from Independent Auditors**

110. The advice and assistance described above, including the execution of sham contracts, also helped foreign schools, including the Defendants' Clients, hide from independent auditors the foreign schools' payments of incentive compensation to Defendants.

111. As explained above, the Defendants' Clients periodically had to submit to the Department of Education the results of compliance audits performed by independent auditors. Beginning with the fiscal year ending December 31, 2020, these auditors had to test for compliance with the Incentive Compensation Ban.

112. The independent auditors that perform these compliance audits examine and rely

22

on a foreign school's records and attestations to determine whether the school complies with the requirements to participate in federal student aid programs.

113.    Beginning with the fiscal year ending December 31, 2020, the Defendants' Clients made false statements to their independent auditors to gain favorable audit results, or withheld material information from their auditors for the same purpose.

114.    In reality, at all relevant times, the Defendants' Clients were paying incentive compensation to the Defendants for recruitment services.

115.    For example, in the case of Bangor University, recent audit reports submitted to the Department of Education contain no findings citing the school's payments of incentive compensation to the Defendants or failure to comply with the Incentive Compensation Ban.

116.    Upon information and belief, Bangor University did not disclose its original 2019 tuition sharing contract with the Defendants or the substance of the school's correspondence with the Defendants described above to the school's independent auditor.

### IV.    The Defendants Caused Their Clients to Submit False Claims

117.    Between January 1, 2015, and the present, the Defendants caused each of their Clients to present at least one claim for payment or approval to the Department of Education while in violation of the Incentive Compensation Ban.

118.    During that time, each of the Defendants' Clients (a) submitted origination details to the Department of Education via COD, and (b) drew down the amount awarded to their students when funds were made available to them through the G5 system.

119.    Prior to completing the draw down of funds through the G5 website, each of the Defendants' Clients agreed with this statement: "I certify, by processing this payment request and/or re-allocation, that the funds are being expended within three days of receipt for the

purpose and condition of the agreement."

120. When the Defendants' Clients submitted these claims to the Department, they were actively violating the Incentive Compensation Ban with the advice and assistance of the Defendants.

121. Consequently, these claims were false or fraudulent.

122. For example, effective on May 27, 2010, Swansea University amended its then-existing PPA with the Department of Education to include participation in the Direct Loan Program. In the school's next re-certification agreement, effective on December 5, 2011, and in subsequent re-certification agreements, including the most recent one, effective on November 30, 2020, the school stated that it would comply with the Incentive Compensation Ban while participating in the Direct Loan Program.

123. However, during that time, Swansea University paid incentive compensation to the Defendants for recruiting American students to attend Swansea University, some of whom received funding from the Direct Loan Program.

124. For example, defendant Study Across the Pond, at the direction and with the assent of defendant John Borhaug, recruited an American student named M.B. to attend Swansea University.

125. M.B. first contacted defendant Study Across the Pond in 2016. As part of the recruitment process, the Company provided M.B. with information about Swansea University and assisted M.B. in completing and submitting an application to Swansea University.

126. Swansea University accepted M.B.'s application and enrolled M.B. in classes beginning with the Fall 2017 term.

127. Swansea University and the Department of Education processed the following

24

awards for M.B. from the Direct Loan Program.

| Award Year | Loan Date | Loan Description | Loan Amount |
|---|---|---|---|
| 2018 | Oct. 6, 2017 | Direct PLUS | $35,287 |
| | | Direct Stafford Unsubsidized | $2,000 |
| | | Direct Stafford Subsidized (SULA Eligible) | $3,500 |
| 2019 | Oct. 5, 2018 | Direct PLUS | $38,081 |
| | | Direct Stafford Unsubsidized | $2,000 |
| | | Direct Stafford Subsidized (SULA Eligible) | $4,500 |
| 2020 | Oct. 4, 2019 | Direct PLUS | $39,698 |
| | | Direct Stafford Unsubsidized | $2,000 |
| | | Direct Stafford Subsidized (SULA Eligible) | $5,500 |
| | | **Total** | $132,566 |

128. M.B. used these federal Direct Plus, Direct Stafford Subsidized, and Direct Stafford Unsubsidized loans to fund M.B.'s undergraduate education at Swansea University. M.B.'s parents took out these loans.

129. For each of M.B.'s loans above, Swansea University submitted origination and actual disbursement information to the Department of Education using the COD system, made the required certification and drew down the amounts awarded through the Department's G5 website, and then disbursed those funds to M.B.'s student account or directly to M.B.'s parents.

130. In January 2018, at the direction and with the assent of defendant John Borhaug, defendant Study Across the Pond submitted a commission claim to Swansea University listing the names of all the students they had recruited for Swansea in the previous term, including M.B. The Company demanded payment of a commission equal to a percentage of the tuition each student on the list had paid for the Fall 2017 term.

131. Upon information and belief, Swansea University paid defendant Study Across

the Pond a commission of £2,870 GBP, or 17.5 percent of M.B.'s tuition less scholarships, for recruiting M.B. to attend Swansea University.

132. Similarly, effective on June 8, 2010, the University of Hertfordshire amended its then-existing PPA with the Department of Education to include participation in the Direct Loan Program. In the school's next re-certification agreement, effective on January 14, 2014, and in subsequent re-certification agreements, including the most recent one, effective on March 23, 2023, the school stated that it would comply with the Incentive Compensation Ban while participating in the Direct Loan Program.

133. However, during that time, the University of Hertfordshire paid incentive compensation to the Defendants for recruiting American students to attend the University of Hertfordshire, some of whom received funding from the Direct Loan Program.

134. For example, defendant Study Across the Pond, at the direction and with the assent of defendant John Borhaug, recruited an American student named C.M. to attend the University of Hertfordshire.

135. C.M. first contacted defendant Study Across the Pond in 2015. As part of the recruitment process, the Company provided C.M. with a list of its partner universities in the United Kingdom that offered programs of interest to C.M.

136. The University of Hertfordshire accepted C.M.'s application and enrolled C.M. in classes beginning with the Fall 2016 term.

137. The University of Hertfordshire and the Department of Education processed the following awards for C.M. from the Direct Loan Program.

| Award Year | Loan Date | Loan Description | Loan Amount |
|---|---|---|---|
| 2017 | 9/26/2016 | Direct PLUS | $22,048 |
| | | Direct Stafford Unsubsidized | $2,000 |
| | | Direct Stafford Subsidized (SULA Eligible) | $3,500 |
| 2018 | 9/20/2017 | Direct PLUS | $35,860 |
| | | Direct Stafford Unsubsidized | $2,000 |
| | | Direct Stafford Subsidized (SULA Eligible) | $4,500 |
| 2019 | 9/12/2018 | Direct PLUS | $29,798 |
| | | Direct Stafford Unsubsidized | $7,000 |
| | | Direct Stafford Subsidized (SULA Eligible) | $5,500 |
| | | **Total** | $112,206 |

138. C.M. used these federal Direct Plus, Direct Stafford Subsidized, and Direct Stafford Unsubsidized loans to fund C.M.'s undergraduate education at the University of Hertfordshire.  C.M. took these loans out in C.M.'s own name.

139. For each of C.M.'s loans above, the University of Hertfordshire submitted origination and actual disbursement information to the Department of Education using the COD system, made the required certification and drew down the amounts awarded through the Department's G5 website, and then disbursed those funds to C.M.'s student account or directly to C.M.

140. At the direction and with the assent of defendant John Borhaug, defendant Study Across the Pond submitted a commission claim to the University of Hertfordshire listing the names of all the students they had recruited for the University of Hertfordshire in the previous term, including C.M.  The Company demanded payment of a commission equal to a percentage of the tuition each student on the list had paid for the Fall 2016 semester.

141. Upon information and belief, the University of Hertfordshire paid defendant

27

Study Across the Pond a commission of £2,200 GBP, or 20 percent of C.M.'s tuition fee, for recruiting C.M. to attend the University of Hertfordshire.

142.   Since January 1, 2015, the Defendants have caused their Clients to submit numerous other false claims to the Department of Education in a similar manner.

**V.     The Defendants Caused Their Clients to Submit False Statements**

143.   Between January 1, 2015, and the present, the Defendants also caused each of their Clients to make one or more false statements to the Department of Education regarding their compliance with the Incentive Compensation Ban.

144.   As explained above, in order to participate in the Direct Loan Program, each of the Defendants' Clients had to agree to comply with the law governing federal student aid programs.  The Defendants' Clients memorialized that agreement by executing PPAs with the Department of Education.

145.   Each of the Defendants' Clients stated to the Department of Education in their PPAs that they—

>      a.     would not provide any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the awarding of student financial assistance; and

>      b.     would comply with all statutory provisions of or applicable to Title IV of the Higher Education Act of 1965, all applicable regulatory provisions prescribed under that statutory authority, and all applicable special arrangements, agreements, and limitations entered into under the authority of statutes applicable to Title IV.

146.   However, when the Defendants' Clients made these statements to the Department

of Education, they were actively violating or intending to violate the Incentive Compensation

Ban with the advice and assistance of the Defendants.

147.    Consequently, these statements were false or fraudulent.

**VI.    The False Statements Were Material to the Decisions to Pay Claims**

148.    The false statements described above had a natural tendency to influence, or be

capable of influencing, the Department of Education's decisions to make Direct Loan Program

funds available to the Defendants' Clients for the benefit of their American students.

149.    If the Defendants' Clients had not executed PPAs with the Department, in which

the Defendants' Clients stated that they would comply with the Incentive Compensation Ban,

then the Department of Education—

    a.    would not have found the Defendants' Clients eligible to participate in the

Direct Loan Program or extended their eligibility to participate in the program; and

    b.    consequently, would not have awarded Direct Loan Program funds to

students enrolled by the Defendants' Clients, accepted the origination and actual

disbursement information the Defendants' Clients submitted using the COD system, or

made funds available to the Defendants' Clients in the amounts awarded through the G5

website.

150.    The Defendants and their Clients knew that these false statements could influence

the Department of Education's decisions to pay claims for Direct Loan Program funds.

151.    The Department of Education has taken action against institutions for violations

of the Incentive Compensation Ban.

152.    That is why the Defendants advised their Clients that the Ban did not apply to

them, why the Defendants executed sham contacts with their Clients, and why the Defendants

helped their Clients to hide the fact that they compensated the Defendants based on their success in securing the enrollment of American students.

## COUNT I: CAUSING FALSE OR FRAUDULENT CLAIMS
## IN VIOLATION OF THE FALSE CLAIMS ACT
### (31 U.S.C. § 3729(A)(1)(A))

153.    The United States incorporates by reference the allegations contained in paragraphs 1 through 152.

154.    Since at least January 1, 2015, the Defendants have knowingly caused false or fraudulent claims to be presented to the United States for payment or approval.

155.    As a result of the false or fraudulent claims, the United States did, in fact, pay claims for Direct Loan Program funds submitted by the Defendants' Clients.

156.    The United States suffered damages as a result of the Defendant's actions.

157.    Accordingly, for their conduct, the Defendants are liable to the United States for treble damages under the False Claims Act, in an amount to be determined at trial, costs, and a civil penalty of $5,000 to $11,000 for each false claim the Defendants caused to be presented on or before November 2, 2015, and as revised by the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, amending the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 C.F.R. Part 85, for each false claim presented after November 2, 2015.

## COUNT II: CAUSING FALSE RECORDS OR STATEMENTS
## TO BE MADE OR USED IN VIOLATION OF THE FALSE CLAIMS ACT
### (31 U.S.C. § 3729(A)(1)(B))

158.    The United States incorporates by reference the allegations contained in paragraphs 1 through 152.

159.    Since at least January 1, 2015, the Defendants have knowingly caused the Defendants' Clients to make false statements in the PPAs the Defendants' Clients executed with

30

the Department of Education.

160.    These false statements were material to the Department of Education's decisions to pay claims for Direct Loan Program funds submitted by the Defendants' Clients.

161.    Accordingly, for their conduct, the Defendants are liable to the United States for treble damages under the False Claims Act, in an amount to be determined at trial, costs, and a civil penalty of $5,000 to $11,000 for each false statement or record the Defendants caused to be made or used by the Defendants' Clients on or before November 2, 2015, and as revised by the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, amending the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 C.F.R. Part 85, for each false statement after November 2, 2015.

## COUNT III: UNJUST ENRICHMENT

162.    The United States incorporates by reference the allegations contained in paragraphs 1 through 152.

163.    Since at least January 1, 2015, the United States has made payments to the Defendants' Clients in the form of Direct Loan Program funds.  These funds were awarded to enrolled students recruited by the Defendants.

164.    These funds were to be used for payment of students' tuition and costs.

165.    However, the Defendants' Clients shared a portion of these Direct Loan Program funds with the Defendants in the form of commissions based directly or indirectly on the Defendants' success in securing student enrollments.

166.    This compensation model violated the rules of the Direct Loan Program, specifically, the Incentive Compensation Ban.  As a result, the Defendants were not entitled to receive the commissions they accepted from their Clients in violation of the Incentive

Compensation Ban.

167.    The Defendants knew or should have known that they were not entitled to receive these commissions, which were prohibited incentive compensation.  Nonetheless, the Defendants retained or used this prohibited incentive compensation for their own purposes.

168.    The United States reasonably expected that the Defendants and their Clients would comply with the laws governing the Direct Loan Program, including the Incentive Compensation Ban.

169.    Because the Defendants knowingly obtained a share of Direct Loan Program funds in violation of federal law, it would be inequitable to allow the Defendants to retain those funds and profit from knowingly violating the law.

170.    Accordingly, the Defendants have been unjustly enriched at the expense of the United States and they are liable to account and pay to the United States the value of these commissions in an amount to be determined at trial.

## PRAYER FOR RELIEF

171.    WHEREFORE, the United States respectfully requests that the Court enter judgment in favor of the United States and against the Defendants:

a.    On Count I, for violations of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A), in an amount equal to the United States' damages, trebled as required by law, costs, and one civil penalty in the amount prescribed by 28 C.F.R. § 85.5 for each false or fraudulent claim the Defendants knowing caused to be presented for payment;

b.    On Count II, for violations of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B), in an amount equal to the United States' damages, trebled as required by law, costs, and one civil penalty in the amount prescribed by 28 C.F.R. § 85.5 for each

false record or statement the Defendants knowingly made, used, or caused to be made or used in a manner material to a false or fraudulent claim;

      c.      On Count III for unjust enrichment at common law, in an amount equal to the incentive compensation the Defendants received for their student recruitment services in violation of the laws of the United States, plus interest, costs, and expenses; and

      d.      any further relief that the Court deems just and proper.

**DEMAND FOR A JURY TRIAL**

The United States hereby demands a jury trial on all claims alleged herein.

Respectfully submitted,

JOSHUA S. LEVY
Acting United States Attorney

*/s/ Brian M. LaMacchia*
BRIAN M. LAMACCHIA
ALEXANDRA BRAZIER
Assistant United States Attorneys
John J. Moakley U.S. Courthouse, Suite 9200
1 Courthouse Way
Boston, MA 02210
Phone: (617) 748-3100
brian.lamacchia@usdoj.gov
alexandra.brazier@usdoj.gov

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

JAMIE ANN YAVELBERG
ALLISON CENDALI
ALLISON C. CARROLL
Attorneys, Civil Division, Commercial
Litigation Branch, Fraud Section
175 N St., N.E.
Washington, D.C. 20002
Phone: (202) 353-1006
Allison.C.Carroll@usdoj.gov

Dated:  April 26, 2024                 *Counsel for the United States of America*