UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, ex rel.<br>HITROST, LLC, | * <br> * <br> * <br> * | |
| Plaintiff, | * <br> * | |
| v. | * <br> * | Civil Action No. 21-cv-10274-ADB |
| STUDY ACROSS THE POND, LLC, and<br>JOHN BORHAUG, | * <br> * <br> * | |
| Defendants. | * <br> * | |

**MEMORANDUM AND ORDER**

BURROUGHS, D.J.

The United States of America ("Plaintiff," "the United States," or "the Government")

alleges that Study Across the Pond, LLC ("SATP"),[1] an organization that recruits American

students to attend schools of higher education in the United Kingdom ("U.K."), and its Chief

Executive Officer and Co-Founder John Borhaug ("Borhaug") (collectively, "the Defendants" or

"Defendants"), violated the False Claims Act ("FCA") by causing U.K. schools that participate

in federal student aid programs to submit false claims to the Department of Education ("the

Department"). Before the Court is Defendants' motion to dismiss the Government's Complaint

in Partial Intervention. [ECF No. 52]. For the reasons set forth below, the motion is **DENIED** in

part and **GRANTED** in part.

---

[1] On January 29, 2024, SATP filed a Certificate of Cancellation with the Secretary of the
Commonwealth of Massachusetts. [ECF No. 38 ¶ 10].

## I.    BACKGROUND

The following facts are taken from Plaintiff's Complaint in Partial Intervention, [ECF No. 38 ("Complaint" or "Compl.")], the factual allegations of which are assumed to be true when considering a motion to dismiss, see Ruivo v. Wells Fargo Bank, N.A., 766 F.3d 87, 90 (1st Cir. 2014).  As it may on a motion to dismiss, the Court has also considered "documents incorporated by reference in [the Complaint], matters of public record, and other matters susceptible to judicial notice."  Giragosian v. Ryan, 547 F.3d 59, 65 (1st Cir. 2008) (alteration in original) (quoting In re Colonial Mortg. Bankers Corp., 324 F.3d 12, 20 (1st Cir. 2003)).

### A.    The Relevant Statutory Scheme: The Higher Education Act and the Incentive Compensation Ban

In order to foster access to higher education, Congress enacted Title IV of the Higher Education Act ("the HEA" or "the Act"), which established several loan and grant programs to help students pay the tuition for their postsecondary education.[2]  20 U.S.C. §§ 1070–1099c-2.  If students receiving such aid default on their loans, the tuition cost shifts to taxpayers.  See Ass'n of Priv. Sector Colls. & Univs. v. Duncan, 681 F.3d 427, 435 (D.C. Cir. 2012).  Postsecondary education institutions, however, "receive the benefit of accepting tuition payments from students receiving federal aid, regardless of whether those students are ultimately able to repay their loans."  Id.  The HEA therefore "created the somewhat undesirable situation in which schools can loan money to students and be guaranteed repayment by the government."  United States v. Educ. Mgmt. Corp., 871 F. Supp. 2d 433, 439 (W.D. Pa. 2012).  In order to combat any real and perceived potential for abuse by postsecondary institutions receiving federal funds, Congress

---

[2] Although the specifics are not important for present purposes, the relevant federal student aid program at issue here is the Direct Loan Program.  [Compl. ¶¶ 23–33].

codified certain statutory requirements for colleges and universities, id., including the Incentive Compensation Ban ("ICB"), which requires postsecondary institutions to:

> not provide any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the award of student financial assistance.

20 U.S.C. § 1094(a)(20); see also 34 C.F.R. § 668.14(b)(22) (implementing regulations).  The Department has interpreted the phrase "[c]ommission, bonus, or other incentive payment" to mean a "sum of money or something of value, other than a fixed salary or wages."  34 C.F.R. § 668.14(b)(22)(iii)(A) (2011).  Current regulation provides that the ICB prohibits "[m]erit-based adjustments to employee compensation . . . based in any part, directly or indirectly, upon success in securing enrollments or the award of financial aid."  Id. § 668.14(b)(22)(ii)(A); see also U. S. ex rel. Mackillop v. Grand Canyon Educ., Inc., 626 F. Supp. 3d 418, 436–37 (D. Mass. 2022).

Any college or university, including foreign institutions, deemed eligible to receive federal funds[3] is required to enter into a Program Participation Agreement ("PPA") with the Department.  By signing a PPA, a postsecondary institution agrees to comply with the ICB as well as all other statutory provisions and requirements of Title IV, including performing and submitting compliance audits and reporting the results to the Department.  34 C.F.R. §§

_____

[3] A postsecondary institution seeking to obtain federal funding under the HEA must first apply to the Department for an eligibility certification.  U.S. ex rel. Main v. Oakland City Univ., 426 F.3d 914, 916 (7th Cir. 2005).  Specifically, the HEA provides that "[i]n order to be an eligible institution for the purposes of any [Title IV] program[,] . . . an institution must be an institution of higher education."  20 U.S.C. § 1094(a).  An institution of higher education is defined as any institution in any state that "is legally authorized within such State to provide a program of education beyond secondary education."  Id. §§ 1001(a)(2), 1002(a)(1), (b)–(c).  If approved, the institution, as well as its students, "submit additional . . . applications for specific grants, loans, or scholarships."  Oakland City Univ., 426 F.3d at 916.

668.14(a)(1), (b)(1), (b)(22); 668.23(h); see also Calisesi ex rel. U.S. v. Hot Chalk, Inc., No. 13-cv-01150, 2015 WL 1966463, at *6 (D. Ariz. May 1, 2015) ("In order for an institution to participate in a Title IV, Higher Education Act program, i.e., become an 'eligible institution,' the institution must enter into a written Program Participation Agreement with the Secretary of the Department of Education and agree that it will comply with all statutes of or applicable to Title IV and all applicable regulations prescribed under Title IV.").

### 1.    The March 17, 2011 "Dear Colleague Letter"

The Department publishes guidance and updates in the form of "Dear Colleague" letters to assist schools with ICB compliance and the other rules governing Title IV programs. On March 17, 2011, after making a series of amendments to the regulations of Title IV,[4] the Department issued such a letter on the topic of incentive compensation. Calisesi, 2015 WL 1966463, at *9. Specifically, the letter discussed the practice of "tuition sharing," in which third parties "charge schools a percentage of [recruited students'] tuition as a way of assuming the business risk associated with student recruitment," and clarified under what circumstances such a practice is not considered a "direct or indirect payment of incentive compensation." [ECF No. 53-1 (the "Dear Colleague Letter") at 8–14]. In relevant part, the Dear Colleague Letter stated:

> "Tuition sharing:" The Department has been informed that some third parties charge institutions a percentage of tuition as a way of assuming the business risk associated with student recruitment.

---

[4] Although not strictly relevant for the purposes of this Order, the Court notes that one of the changes to the regulation was the elimination of so-called "safe harbor" provisions, which allowed "payment of fixed compensation, such as a fixed annual salary or a fixed hourly wage, as long as that compensation [was] not [among other things] . . . based solely on the number of students recruited, admitted, enrolled, or awarded financial aid." Grand Canyon Educ., 626 F. Supp. 3d at 436; 34 C.F.R. 668.14(b)(22)(ii)(A)), repealed by 75 Fed. Reg. 66832, 66950 (Oct. 29, 2010). As part of a set of amendments published on October 29, 2010, the Department removed this "safe harbor" provision. 34 C.F.R. § 668.14; Grand Canyon Educ., 626 F. Supp. 3d at 436–37.

Further, such third parties have typically combined student recruitment services with other services not covered by the incentive compensation prohibition, such as advertising, marketing, counseling, and support services to admitted students, and verification of student aid application information.

Section 487(a)(20) of the HEA mandates that the "institution will not provide any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the award of student financial assistance." The Department generally views the payment based on the amount of tuition generated as an indirect payment of compensation based on success in recruitment and therefore a prohibited basis upon which to measure the value of the services provided. This is true regardless of the manner in which the entity compensates its employees.

However . . . the Department does not consider payment based on the amount of tuition generated by an institution to violate the incentive compensation ban if that payment compensates an unaffiliated third party that provides a set of services that may include recruitment services. The independence of the third party (both as a corporate matter and as a decision maker) from the institution that provides the actual teaching and educational services is a significant safeguard against the abuses the Department has seen heretofore. When the institution determines the number of enrollments and hires an unaffiliated third party to provide bundled services that include recruitment, payment based on the amount of tuition generated does not incentivize the recruiting as it does when the recruiter is determining the enrollment numbers and there is essentially no limitation on enrollment.

. . .

Example 2-B: A third party that is not affiliated with the institution it serves and is not affiliated with any other institution that provides educational services, provides bundled services to the institution including marketing, enrollment application assistance, recruitment services, course support for online delivery of courses, the provision of technology, placement services for internships, and student career counseling. The institution may pay the entity an amount based on tuition generated for the institution by the entity's activities for all bundled services that are offered and provided collectively, as long as the entity does not make prohibited compensation payments to its employees, and the institution does not pay the entity separately for student recruitment services provided by the entity.

5

. . .

> In all of these examples, the institution receiving title IV funds remains responsible for the actions of any entity that performs functions and tasks on the institution's behalf. These responsibilities include ensuring that employees are not paid for services that would convert these payments into prohibited incentive compensation because of the activity the employees engage in.

[Id. at 12–13 (emphases added)].  Thus, the Dear Colleague Letter, as relevant for present purposes, clarified that if a third party offers a bundle of services such as marketing, enrollment application assistance, or course support for the online delivery of courses ("Bundled Services Provider"), and not just recruitment services, a tuition sharing agreement does not violate the ICB as long as the third party (a) "does not make prohibited compensation payments to its employees" and (b) "the institution does not pay [the third party] separately for student recruitment services."  [Id. at 13]; see also [Compl. ¶ 21 ("The Department of Education refers to these third parties as Bundled Services Providers.")].

## B.    Factual Background

SATP provided recruitment, marketing, and other services to numerous colleges and universities in the U.K.  [Compl. ¶¶ 11, 67–69].  A subset of these colleges and universities ("the Defendants' Clients" or "the Clients") participated in federal student aid programs under Title IV of the HEA, and since 2015, each of these Clients presented at least one claim for payment from those programs to the Department.[5]  [Id. ¶¶ 11–14].  The Clients, by signing the PPA, "had to

---

[5] The Defendants' Clients are: Aberystwyth University, Bangor University, University of Brighton, Cardiff University, University of Chester, University of East Anglia, Edinburgh Napier University, University of Essex, University of Exeter, University of Greenwich, University of Hertfordshire, University of Kent, Kingston University, University of Lancaster, University of Leeds, University of Leicester, University of Lincoln, University of Liverpool, Loughborough University, Oxford Brookes University, University of Reading, University of Sheffield,

agree to comply with the law governing federal student aid programs." [Id. ¶¶ 144–45].  At various times since January 1, 2015, students successfully recruited by SATP received Direct Loan Program funding to help them pay the tuition and costs charged by these schools.  [Id. ¶¶ 53–54].

For its services, SATP was paid a percentage of the tuition as a commission for each student who enrolled at one of the Clients' schools.  [Compl. ¶ 53].  In addition to base commissions, some of the Defendants' Clients also paid so-called "progression commissions," which allowed the Defendants to receive a percentage of the tuition paid by recruited students who attended the school for a second year or enrolled in a second degree program with the Client.  [Id. ¶ 54].  Starting on January 25, 2021, for example, the University of Liverpool, one of the Defendants' Clients, agreed to pay commissions based on student recruitment as follows: (i) 10% of fees paid by a recruited student for pre-sessional English Language courses, study abroad programs, or fee-paying postgraduate research programs; (ii) for the first thirty students recruited during the cycle, 12.5% of each student's first year tuition fees for programs lasting at least one year; and (iii) for any additional recruited students, 15% of each student's first year tuition fees for programs lasting at least one academic year.  [Id. ¶ 55].

Defendants charged the Clients for a range of services.  [Compl. ¶¶ 67–75].  Plaintiff alleges that SATP "charged separate, one-time fees . . . for running digital marketing campaigns . . . and travel expenses for promoting foreign schools . . . at college fairs or recruitment events."  [Id. ¶¶ 69–70].  SATP, "at the direction and with the assent of . . . Borhaug, invoiced its Clients for [such] services separately from the recruitment services, and its Clients

---

University of Southampton, University of Stirling, University of Strathclyde, Swansea University, University of Winchester, and University of York.  [Compl. ¶ 14].

paid those invoices accordingly." [Id. ¶ 71]. For example, in 2018, SATP issued separate

marketing and recruitment invoices to the University of Southampton as follows:

| INVOICE NUMBER | INVOICE DATE | DESCRIPTION | AMOUNT (USD) | AMOUNT (GBP) |
|---|---|---|---|---|
| 14423 | Feb. 26, 2018 | Commission 2017-2018 | $22,075.98 | £16,086.85 |
| 14473 | June 5, 2018 | Annual Representation Fee – USA | $1,978.20 | £1,500.00 |
| | | Annual Representation Fee – Canada | $989.10 | £750.00 |
| | | Annual Representation Fee – CLFA | $3,956.40 | £3,000.00 |
| 14474 | July 5, 2018 | Annual Representation Fee – Latin America | $1,618.75 | £1,250.00 |
| 14486 | July 5, 2018 | Digital Marketing | $3,956.40 | £3,000.00 |
| 14490 | July 9, 2019 | Participation in 2018 Canada Law from Abroad Week | $787.38 | £600.87 |

[Id. ¶ 72]. While Invoices 14473, 14474, 14486, and 14490 each billed a flat fee for generalized,

annual marketing benefits, including a one-time digital marketing campaign and travel expenses

associated with a recruitment event, Invoice 14423 reflected billing for a commission equal to a

percentage of the tuition paid by the students Defendants recruited to the University. [Id. ¶¶ 73–

74].

SATP paid their student-facing employees and contractors, called "Student Advisors,"

who helped students in the United States apply to U.K. schools, a base salary plus commission or

bonus payments. [Compl. ¶¶ 59, 61]. Specifically, an "applicant commission" was based on the

number of students who applied to a foreign school with the Student Advisors' assistance, and a

"conversion commission" was based on the number of those students who ultimately enrolled in

a U.K. school. [Id. ¶ 61]. In order to be eligible for that commission, a Student Advisor first had

to meet a quota of a number of students applying to foreign schools. [Id. ¶¶ 63–64]. By way of

example, for the year beginning September 1, 2020, a Student Advisor was offered an applicant

commission of $50 per student for each student after the fiftieth that the advisor assisted in

successfully applying.  [Id. ¶ 62].  During the high-volume application season, this commission increased to $65 per student for each student after the fiftieth.  [Id.].  The Student Advisor could also earn a conversion commission of $1,500 when 48% or more of the advisor's applicants registered and paid for their tuition at a partner U.K. school.  [Id.].  "Borhaug and other managers of . . . SATP told Student Advisors that the Company would not be paid by a partner school until students recruited by the Company paid tuition and started attending classes."  [Id. ¶ 78].

In 2013, the University of Exeter asked an SATP employee whether it was "illegal for [them] to pay commission on any U.S. student in receipt of a U.S. federal loan."  [Compl. ¶ 85]. The SATP employee, copying Borhaug, responded that the rule did not apply to SATP.  [Id. ¶ 86].  The SATP employee further offered to make changes to how payments were classified, including introducing a flat fee based on marketing and promotional services that would be the "equivalent of what [the] commission would have been."  [Id. ¶ 86]; [ECF No. 53-3 at 4]. Borhaug also responded to the University of Exeter, confirming, among other things, that SATP is open to making changes to the contract.  [Compl. ¶ 86]; [ECF No. 53-3 at 2].

Further, in January 2021, the University of Southampton, another Client, emailed SATP and included a link to a recently revised foreign schools audit guide published by the Inspector General of the Department and directed SATP's employee to an updated section on commissions.  [Compl. ¶ 91]; [ECF No. 53-4 at 4].  The SATP employee then forwarded the email to Borhaug, asking whether SATP should seek legal advice.  [Compl. ¶ 93]; [ECF No. 53-4 at 3].  The SATP employee wrote that "in terms of risk assessment this hasn't been as big a thing as it might . . . but it certainly has potential to 'explode' if someone did end up getting pulled up for their relationship with us."  [Compl. ¶ 93]; [ECF No. 53-4 at 2].  Borhaug responded there was not "anything really new" in the guidance.  [Compl. ¶ 94]; [ECF No. 53-4 at

2].  He further wrote that SATP "sit[s] right in the borderline of what they are talking about where you could make an argument that we fall on either side of it if your [sic] really wanted to make the case for that side."  [ECF No. 53-4 at 2].  He further explained that "straight up commission contracts aren't ideal, but some amended wording ought to be ok."  [Id.].  Borhaug also told the SATP employee that:

> [I]f [the University of Southampton] [were] audited and we [came] up, if somebody WANTS to make a problem, it [would] be a problem (but still ought to be fine), if they aren't looking to make one, it [wouldn't] be.  At the end of the day, they have the list/document of what is permitted right there in the text — if they are concerned, put that wording in the contract, and then why wouldn't it be fine?

[Compl. ¶ 94]; [ECF No. 53-4 at 2].

The United States alleges that "[a]t the direction and with the assent of . . . Borhaug, [SATP] also provided foreign schools, including some of the Defendants' Clients, with templates to help them draft sham contracts."  [Compl. ¶ 95].  For example, SATP entered into a five-year contract with the University of Southampton, beginning on February 15, 2016, in which the school agreed to pay SATP "a fee which amount should be determined on an annual basis . . . regardless of the number of students who enroll at [the university] as a result of [SATP's] services."  [Id. ¶ 98].  Borhaug instructed an employee involved in the negotiations with the University of Southampton "to clarify that they understand and agree . . . we are going to work to a 2000 GBP student measure for this year, but that this would have to increase by 150 pounds each year, or increase by an equivalent sum to tuition increases each time tuition fees are increased."  [Id. ¶ 99].  He further wrote that "this doesn't get put in writing, it is just understood/agreed verbally."  [Id.]

Starting on February 1, 2019, Bangor University agreed to pay commission to SATP for recruiting students from the United States.  [Compl. ¶ 102].  Specifically, the agreement provided for commissions as follows: "for students that enrolled in an English Language Program at the University's English Language Centre and paid the tuition fees in full, commission of 20% of the tuition fee for the first five students and 25% for any additional students" and "for students that enrolled in a standard program and paid the tuition fees, commissions" based on the number of students enrolled, so 20% for 1–10 students; 25% for 11–15 students, etc.  [Id.].  Then, in early 2020, Bangor University contacted SATP for guidance on how to pay SATP its commission for American students who received awards from the Direct Loan Program.  [Id. ¶ 103].  The university inquired "whether [it] can consider putting a 'Marketing Agreement' in place for the US in case of audit by [the Department of Education]."  [Id. (alterations in original)].  An SATP employee responded that other schools were paying an annual marketing fee in an amount equivalent to a commission based on tuition sharing and directed Bangor University to a template of such an agreement.  [Id.]  Later in 2020, Bangor University entered into a new agreement with Across the Pond Study in Britain Ltd., which the Court understands to be an affiliate of SATP.[6]  [Id. ¶ 104]; see [ECF No. 53 at 8].  The agreement covered only students from the United States and included a flat fee of £15,500 for one year of services, [Compl. ¶ 104], and Bangor University and Across the Pond Study in Britain Ltd. amended their 2019 agreement to exclude students from the United States, [id. ¶ 105].  An SATP employee notified Borhaug of the change and requested his approval, writing that "basically they are just literally

_____

[6] On May 22, 2024, Relator Hitrost LLC moved to dismiss all defendants except for SATP and Borhaug.  [ECF No. 46].  Accordingly, Across the Pond Study in Britain Ltd. was terminated as a party on May 23, 2024.

moving what's owed as commission equivalency for the Americans, after all calculations are made, and paying it as marketing fee."  [Id. ¶ 106].  Borhaug responded, "Yes, that would work." [Id.]

### C.    Procedural History

On February 17, 2021, Relator Hitrost LLC filed a complaint under seal against Defendants, various affiliates, and Defendants' Clients.  [ECF No. 2].  On January 26, 2024, the United States moved for partial intervention against Defendants, [ECF No. 36], filing its Complaint on April 26, 2024, [ECF No. 38].  Defendants moved to dismiss the Complaint on August 5, 2024, [ECF No. 52], and the United States opposed on August 19, 2024, [ECF No. 54].

## II.    LEGAL STANDARD

On a motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court must accept as true all well-pled facts, analyze them in the light most favorable to the plaintiff, and draw all reasonable inferences from those facts in favor of the plaintiff.  U.S. ex rel. Hutcheson v. Blackstone Med., Inc., 647 F.3d 377, 383 (1st Cir. 2011). Additionally, "a court may not look beyond the facts alleged in the complaint, documents incorporated by reference therein and facts susceptible to judicial notice."  MIT Fed. Credit Union v. Cordisco, 470 F. Supp. 3d 81, 84 (D. Mass. 2020) (citing Haley v. City of Bos., 657 F.3d 39, 46 (1st Cir. 2011)).  "[A] complaint must provide 'a short and plain statement of the claim showing that the pleader is entitled to relief,'" Cardigan Mountain Sch. v. N.H. Ins. Co., 787 F.3d 82, 84 (1st Cir. 2015) (quoting Fed. R. Civ. P. 8(a)(2)), and set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory."  Pitta v. Medeiros, 90 F.4th 11, 17 (1st Cir. 2024)

12

(quoting Gagliardi v. Sullivan, 513 F.3d 301, 305 (1st Cir. 2008)).  Although detailed factual allegations are not required, a complaint must set forth "more than labels and conclusions," Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007), and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  Rather, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Id. (quoting Twombly, 550 U.S. at 570).

Because the United States brings its claims under the FCA, it must also plead them "with plausibility and particularity under Federal Rules of Civil Procedure 8 and 9(b)."  Universal Health Servs., Inc. v. U.S. ex rel. Escobar ("Escobar II"), 579 U.S. 176, 195 n.6 (2016); see also U.S. ex rel. Gagne v. City of Worcester, 565 F.3d 40, 45 (1st Cir. 2009) ("[T]he heightened pleading requirements of Fed. R. Civ. P. 9(b) apply to claims brought under subsection (a)(1) of the FCA.").  To comply with Rule 9(b) in an FCA case, a plaintiff must "set forth with particularity the who, what, when, where, and how of the alleged fraud."  Lawton ex rel. U.S. v. Takeda Pharm. Co., 842 F.3d 125, 130 (1st Cir. 2016) (quoting U.S. ex rel. Ge v. Takeda Pharm. Co., 737 F.3d 116, 123 (1st Cir. 2013)).  Because the "FCA penalizes persons who present, or cause to be presented, to the federal government 'a false or fraudulent payment or approval,' . . . Rule 9(b) requires both that the circumstances of the alleged fraud and the claims themselves be alleged with particularity."  Id. (first quoting 31 U.S.C. § 3729(a)(1); then citing U.S. ex rel. Rost v. Pfizer, Inc., 507 F.3d 720, 727 (1st Cir. 2007), overruled on other grounds by Allison Engine v. U.S. ex rel. Sanders, 553 U.S. 662 (2008)).

The First Circuit has made a distinction between actions where the defendant is alleged to have made false claims to the government and those where the defendant is alleged to have

induced a third party to file false claims.  Lawton, 842 F.3d at 130.  Regarding the latter, the First

Circuit applies a "'more flexible' standard," allowing a relator to provide "factual or statistical

evidence to strengthen the inference of fraud beyond possibility without necessarily providing

details as to each [submitted] false claim."  Id. (alteration in original) (quoting U.S. ex rel.

Duxbury v. Ortho Biotech Prods., L.P., 579 F.3d 13, 29 (1st Cir. 2009)).  "Such evidence must

pair the details of the [fraudulent] scheme with 'reliable indicia that lead to a strong inference

that claims were actually submitted.'"  U.S. ex rel. Nargol v. DePuy Orthopaedics, Inc., 865 F.3d

29, 39 (1st Cir. 2017) (quoting Duxbury, 579 F.3d at 29).  Therefore, "evidence necessary to

achieve this inference generally requires [Plaintiff] to plead, inter alia, the 'specific [institutions]

who allegedly submitted false claims,' the 'rough time periods, locations, and amounts of the

claims,' and 'the specific government programs to which the claims were made.'"  United States

v. Aegerion Pharms., No. 13-cv-11785, 2019 WL 1437914, at *4 (D. Mass. Mar. 31, 2019)

(quoting U.S. ex rel. Kelly v. Novartis Pharms. Corp., 827 F.3d 5, 13 (1st Cir. 2016)).

## III.    DISCUSSION

### A.    False Claims Act: Count I (False Claims) and Count II (False Statements)

Plaintiff alleges that Defendants engaged in a scheme to induce their Clients to

compensate SATP for recruitment services, even though Defendants did not qualify as a Bundled

Services Provider, and disguised these arrangements in sham contracts, which described these

services as marketing or other non-recruitment efforts.  In compensating Defendants based on the

success of student enrollment, the Clients violated the ICB, and Defendants therefore caused the

Clients to submit false claims to the Government in violation of the FCA.  [ECF No. 54 at 1–2].

Specifically, Plaintiff alleges that Defendants violated the FCA under the statute's presentment

clause (Count I), 31 U.S.C. § 3729(a)(1)(A), and false records clause (Count II), id. §

3729(a)(1)(B).  Whereas the presentment clause imposes liability by "knowingly present[ing], or caus[ing] to be presented, a false or fraudulent claim for payment or approval," id. § 3729(a)(1)(A), the false record clause imposes liability by "knowingly mak[ing], us[ing], or caus[ing] to be made or used, a false record or statement material to a false or fraudulent claim," id. § 3729(a)(1)(B).  Under either theory, whether Defendants violated the FCA "hinges on four elements[, namely] whether (1) claims or statements were made; (2) these claims or statements were false; (3) these falsehoods were material; and (4) these statements were made with scienter of the falsehood."  Grand Canyon Educ., 626 F. Supp. 3d at 444–45.  "The 'sine qua non' of a False Claims Act violation is, as the name of the statute would suggest, an 'actual false claim.'" United States v. Pfizer, Inc., 188 F. Supp. 3d 122, 129 (D. Mass. 2016) (citation omitted).

### 1. Whether Claims or Statements Were Made.

For an FCA violation, the first element requires the Court to assess whether claims or statements were made.  The FCA defines a claim as "any request or demand . . . for money or property . . . that . . . is presented to an officer, employee, or agent of the United States."  31 U.S.C. § 3729(b)(2)(A).  A "claim" may include "direct requests to the Government for payment" or "reimbursement requests made to the recipients of federal funds under federal benefits programs."  U.S. ex rel. Verrinder v. Wal-Mart Corp., No. 13-cv-11147, 2016 WL 3460310, at *3 (D. Mass. June 21, 2016) (quoting Escobar II, 579 U.S. at 182).  Further, an entity such as SATP, which does not directly submit a claim to the government, may be held liable under the FCA as a "non-submitting entity" if it "knowingly causes the submission a false claim."  Guilfoile v. Shields, 913 F.3d 178, 187 (1st Cir. 2019) (emphasis added).  As relevant here, a "claim exists when a University signs a PPA and later submits applications for Title IV funds."  Grand Canyon Educ., 626 F. Supp. 3d at 445.

Here, Defendants seemingly do not dispute that its Clients submitted claims for payments or statements to the Department.  See [ECF No. 53 at 10–13].  Given that Defendants' Clients participated in federal loan programs and each presented at least one claim for payment under the Department's federal student aid programs, [Compl. ¶¶ 11–14, 143–45], the Court is satisfied that Plaintiff has sufficiently alleged the existence of claims or statements made.

### 2. Whether Claims or Statements Were False.

As to the second element — falsity — Defendants assert that because SATP is a Bundled Services Provider and as such may be compensated for recruitment services, Defendants' Clients did not violate the ICB and therefore did not submit false claims to the Government.  [ECF No. 53 at 11–13].  Defendants first contend that Plaintiff only asserts in conclusory terms that SATP is not a Bundled Services Provider.  [Id. at 11–12].  They further assert that Plaintiff focuses too narrowly on a single permissible business model as described in the Dear Colleague Letter, Example 2-B, and wrongly roots its argument that SATP violates the ICB in SATP's alleged failure to comply with two exceptions in that example.  [Id. at 12, 20–21].  Plaintiff replies that the Dear Colleague Letter plainly states that tuition sharing is a prohibited form of incentive compensation unless the third party offers "bundles of services" and does not make prohibited compensation payments to its employees.  [ECF No. 54 at 6–8].

As a threshold issue, the Court addresses Defendants' void for vagueness argument regarding the Dear Colleague Letter.  Specifically, Defendants claim that Plaintiff bases its argument that SATP runs afoul of the ICB solely on an example of a permissible business model in the Dear Colleague Letter, Example 2-B,[7] which "does not clearly identify any prohibited

---

[7] For ease of reference, Example 2-B provides:

conduct." [ECF No. 53 at 20]. As such, Defendants argue that the Government's reliance on

Example 2-B as a basis for liability is misplaced given the vague nature of the guidance. [ECF

No. at 53 at 20–21].

The void for vagueness doctrine typically applies to criminal statutes,[8] though it has also

been applied to civil statutes in limited circumstances. See, e.g., Sessions v. Dimaya, 584 U.S.

148, 150 (2018) (applying the void-for-vagueness doctrine in the context of deportation statutes).

It generally requires that criminal statutes define with sufficient definiteness what conduct is

prohibited. Id. at 156–57; see Grayned v. City of Rockford, 408 U.S. 104, 108 (1972) ("It is a

---

> A third party that is not affiliated with the institution it serves and is
> not affiliated with any other institution that provides educational
> services, provides bundled services to the institution including
> marketing, enrollment application assistance, recruitment services,
> course support for online delivery of courses, the provision of
> technology, placement services for internships, and student career
> counseling. The institution may pay the entity an amount based on
> tuition generated for the institution by the entity's activities for all
> bundled services that are offered and provided collectively, as long
> as the entity does not make prohibited compensation payments to its
> employees, and the institution does not pay the entity separately for
> student recruitment services provided by the entity.

[Dear Colleague Letter at 13].

[8] Specifically, "[t]he Due Process Clause 'mandates that, before any person is held responsible for violation of the criminal laws of this country, the conduct for which he is held accountable be prohibited with sufficient specificity to forewarn of the proscription of said conduct.'" United States v. Lachman, 387 F.3d 42, 56 (1st Cir. 2004) (quoting United States v. Anzalone, 766 F.2d 676, 678 (1st Cir. 1985)). "The 'void for vagueness doctrine' addresses at least two discrete due process concerns: 'first, . . . regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way.'" United States v. Zhen Zhou Wu, 711 F.3d 1, 13 (1st Cir. 2013) (quoting FCC v. Fox Television Stations, Inc., 567 U.S. 239, 253 (2012)). The doctrine also applies to situations where a statute "abuts upon sensitive areas of basic First Amendment freedoms." Grayned v. City of Rockford, 408 U.S. 104, 108–09 (1972) (quoting Baggett v. Bullitt, 377 U.S. 360, 372 (1964)).

basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined."). The Court is not aware of any authority, and Defendants fail to direct the Court to any, explaining in what context agency guidance may be unconstitutionally vague. The Dear Colleague Letter does not by itself create or purport to create law. [Dear Colleague Letter at 1]. It is merely meant to provide guidance on a previously issued final regulation concerning incentive compensation. [Id. at 1]. The relevant statutory authority, which Defendants do not claim is vague, was and remains the ICB and its implementing regulations, which have expressly and clearly disallowed compensating recruiters "based in any part, directly or indirectly, upon success in securing enrollments." Leveski v. ITT Educ. Servs., Inc., 719 F.3d 818, 820 (7th Cir. 2013) (quoting 34 C.F.R. § 668.14(b)(22)(ii)(A) (2013)).

Further, to the extent that Defendants argue that the Dear Colleague Letter is vague, the Court disagrees. The Letter is clear that tuition sharing as a measure of compensation falls within the ICB when it is "based on a formula that relates to the amount payable to the entity [such as SATP] to the number of students enrolled as a result of the activity of the entity." [Dear Colleague Letter at 11]. In contrast, "[t]uition as a source of revenue from which compensation is paid to an unrelated third party [such as SATP] for a variety of bundled services" does not constitute "direct or indirect payment of incentive compensation." [Id. at 11]. In sum, the Court not only considers Defendants' reliance on the vagueness doctrine misplaced but also finds that the Dear Colleague Letter does not lack clarity.

As to whether Plaintiff has adequately pled that SATP does not qualify as a Bundled Services Provider, the Court finds that Plaintiff has carried its burden at this stage of the litigation. Although SATP offers more than just recruitment services, Plaintiff has offered more than conclusory allegations and instead stated facts indicating that at least one Client, the

University of Southampton, paid for recruitment services separately and received a commission equal to a percentage of the tuition paid by the students Defendants recruited to the University. [Compl. ¶¶ 73–74]. Further, Plaintiff has adequately pled that at least one Client, Bangor University, agreed to pay a commission to SATP for recruiting students from the United States between 2019 and 2020.[9] [Id. ¶ 102]. Given that these Clients certified compliance with the ICB in their PPAs, [id. ¶¶ 11–14], Plaintiff has sufficiently alleged that false claims and statements were made.[10]

### 3. Whether Defendants' Actions Caused False Claims to be Submitted or Caused False Statements to be Made.

Defendants next argue that "[e]ven if the [Clients] presented false claims or made false statements by certifying compliance with the ICB in their PPAs, the Government has failed to allege that the Defendants caused these claims to be made or caused the [Clients] to make false statements/records." [ECF No. 53 at 13]. Defendants argue that Plaintiff relies on conclusory allegations that SATP entered into "sham contracts" to hide tuition sharing agreements without explaining the "who, what, when, where, and how of the alleged fraud," as required by Rule 9(b). [Id. at 14]. Specifically, Defendants aver that Plaintiff cherry-picks language from email

---

[9] Based on the facts alleged in the Complaint, the Court understands that the University of Bangor entered a separate contract with Across the Pond Study in Britain Ltd. sometime in 2020. [Compl. ¶¶ 103–05]. In arriving at its conclusions for the purposes of this Order, the Court does not rely on any facts as they pertain to SATP's affiliate in the UK.

[10] To the extent Defendants rely on Plaintiff's decision not to pursue action against fifty-two universities that were named defendants in the Relator's Complaint to support its argument that no false claims were submitted, the Court need not consider it. The Government has discretion whether to pursue a Relator's action, and the Court will not indulge in speculation as to why Plaintiff decided to pursue or not pursue certain claims. See 31 U.S.C. § 3730.

correspondence between SATP and its Clients and fails to "plead facts demonstrating a nexus between these communications and any false claims or false statements/records."  [Id. at 14–15].

As an initial matter, the Court observes that "[w]hen the defendant in an FCA action is a non-submitting entity, the question is whether that entity knowingly caused the submission of either [] false or fraudulent claim[s] or false records or statements to get such a claim paid." Blackstone Med., Inc., 647 F.3d at 389; id. at 378–81 (observing that "the Supreme Court has long held that a non-submitting entity may be liable under the FCA for knowingly causing a submitting entity to submit a false or fraudulent claim, and it has not conditioned this liability on whether the submitting entity knew or should have known about the non-submitting entity's unlawful conduct").

The Court is satisfied that Plaintiff has sufficiently alleged that Defendants caused their Clients to submit and make false statements.  Plaintiff states that when Clients, such as the Universities of Exeter or Southampton, reached out to SATP seeking confirmation that they were in compliance with the ICB, SATP and Borhaug seemingly offered assurances that they were. See, e.g., [Compl. ¶¶ 84–100].  SATP also offered to make changes to "how payments are classified and handled," [ECF No. 53-3 at 4], including converting a contract into a flat fee that would be "the equivalent of what commission would have been," [Compl. ¶ 86].  For example, in response to Southampton's query, an SATP employee suggested that the university "play it safe and have a general marketing and promotional arrangement and an annual fee instead of commission [contract] . . . and the annual fee happens to be the equivalent of 'commission' on any students on the lists who actually enrolled."  [Id. ¶ 92 (alteration in original)].  The SATP employee concluded that "[i]n practical terms as long as we (university and [SATP]) understand how the annual amount is calculated then that's all that matters, since it won't be written into a

contract of any kind." [Id.].  These institutions reached out to Defendants because they had

compliance concerns.  It is reasonable to assume that Defendants' assurances and

recommendations about the wording of contracts influenced their decision to continue using

SATP's services and, therefore, the filing of false claims to the Government.  At this juncture,

Plaintiff prevails.[11]

### 4. Whether Scienter is Sufficiently Alleged.

Defendants argue that Plaintiff fails to show the requisite scienter because Defendants (i)

believed they were in compliance with the ICB and (ii) did not know which universities received

Title IV funding.  [ECF No. 53 at 17–19].  Plaintiff replies that it need not allege that each of the

Clients received Title IV funding and that the specific email exchanges between Defendants and

its Clients, together "with allegations as to the broader scheme and active concealment,"

adequately meet the statute's scienter requirement.  [ECF No. 54 at 11–12].

---

[11] Defendants argue that the email correspondences quoted by Plaintiff "convey[] a completely different conversation when viewed in [their] entirety" and do not indicate that Defendants caused their Clients to submit false claims.  [ECF No. 53 at 14 (referring to ECF No. 53-3); ECF No. 53 at 15 (referring to ECF No. 53-4)].  With regard to [ECF No. 53-3], Defendants' email correspondence with Exeter University, Defendants point to SATP telling Exeter "to make any adjustments [Exeter] would feel are necessary" and Borhaug confirming that he believed "it is fair to say that by all accounts everything seems to be ok."  [ECF No. 53-3 at 2,4]; [ECF No. 53 at 14].  Similarly, Defendants assert that Plaintiff omits important contextual language from Defendants' correspondence with the University of Southampton, such as the fact that a university employee wrote that they would "be checking . . . [the audit guide] . . . over with [their] legal team before [they] look at sorting a new agreement."  [ECF No. 53 at 15]; [ECF No. 53-4 at 3].  Setting aside that such language does not clearly indicate that Defendants did not cause their Clients to make or submit false claims, the Court also notes that it cannot resolve such a factual dispute at this stage.  Here, the Court must accept as true Plaintiff's well-pled allegations and draw all reasonable inferences in Plaintiff's favor.  See also Armstrong v. White Winston Select Asset Funds, LLC, No. 16-cv-10666, 2020 WL 10316643, at *1 (D. Mass. Mar. 23, 2020) ("[C]redibility determinations are not appropriate at the motion to dismiss stage.").

The FCA's "scienter requirement defines 'knowing' and 'knowingly' to mean that a person has 'actual knowledge of the information,' 'acts in deliberate ignorance of the truth or falsity of the information,' or 'acts in reckless disregard of the truth or falsity of the information.'" <u>Escobar II</u>, 579 U.S. at 182 (quoting 31 U.S.C. § 3729(b)(1)(A)). "The FCA's scienter element refers to respondents' knowledge and subjective beliefs — not to what an objectively reasonable person may have known or believed." <u>U.S. ex rel. Schutte v. SuperValu Inc.</u>, 598 U.S. 739, 749 (2023). Further, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

Plaintiff has identified two specific instances where universities reached out to SATP voicing concerns regarding their compliance with the ICB. [Compl. ¶¶ 84–100]. The internal email discussions that followed these queries suggest that SATP and Borhaug knew that they were walking a fine line between what is and what is not permissible under the ICB. Borhaug, for instance, wrote that "[f]undamentally we sit right in the borderline . . . where you could make an argument that we fall on either side of it if your [sic] really wanted to make the case for that side." [ECF No. 53-4 at 2]. Defendants then offered to reword contracts to comply with the ICB requirements without actually changing the compensation arrangements. [Compl. ¶¶ 84–100, <u>id.</u> ¶ 86 (offering to convert the existing commission contract to a flat fee contract, so long as the flat fee was "the equivalent of what commission would have been,")]; [ECF No. 53-3 at 4 (SATP offering to make changes as to "how payments are classified and handled")]. Although pled

thinly, at this stage of the proceedings, and in drawing all reasonable inferences in Plaintiff's favor, Plaintiff has met its burden.[12]

### 5. Whether Materiality is Adequately Alleged.

Defendants argue that Plaintiff has failed to allege materiality because the Department continued to disburse Title IV funds to Clients after being notified that they were violating the ICB. [ECF No. 53 at 19–20]. Plaintiff responds that materiality ought to be assessed holistically and that the Government's decision to continue disbursing funds to Clients is not dispositive. [ECF No. 54 at 13–15 (citing Escobar II, 579 U.S. at 190)]. The Court agrees.

The FCA's materiality requirement "defines 'material' to mean 'having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.'" Escobar II, 579 U.S. at 182 (quoting 31 U.S.C. § 3729(b)(4)). The materiality analysis requires a "holistic approach" that considers three non-dispositive factors: (1) whether regulatory compliance was a condition of payment; (2) the centrality of the relevant requirements to the regulatory program; and (3) whether the government paid out on particular claims despite actual knowledge that the supposedly material requirements had been violated. See U.S. ex rel. Escobar v. Universal Health Servs., Inc. ("Escobar III"), 842 F.3d 103, 110 (1st Cir. 2016).

Here, the first prong of the test is satisfied. The Department of Education "includes within its PPAs an explicit reference to the Compensation Ban." Grand Canyon Educ., 626 F. Supp. 3d at 449. That is, "[h]ad Defendant[s] not certified in its [PPAs] that it complied with the [Compensation Ban], it could not have been paid because Congress required as much." Id. (first,

---

[12] Defendants further argue that the allegations against Borhaug are sparse and largely conclusory. [ECF No. 53 at 16]. In light of the discussion supra, the Court disagrees, and accordingly finds that Plaintiff has sufficiently pled a claim against Borhaug and SATP.

third, and fourth alterations in original) (quoting <u>U.S. ex rel. Rose v. Stephens Inst.</u>, 909 F.3d 1012, 1020 (9th Cir. 2018)).

As to the second prong, the centrality requirement, the Court similarly finds that it is met: "[c]ompensation [b]an compliance is an unambiguous condition of receiving Title IV funds and Department of Education regulations."  <u>Grand Canyon Educ.</u>, 626 F. Supp. 3d at 449 (first citing 20 U.S.C. § 1094(a)(20); then citing 34 C.F.R. § 668.14(b)(22)).

Finally, with regard to the third prong, the Department's decision to continue disbursing Title IV funds after being "notified of [the Clients] violations," [ECF No. 53 at 20], is not dispositive.  There is, for one, no evidence that the Department had actual knowledge of the purported violations, but even so, the First Circuit has found that actual knowledge is not dispositive.  <u>Escobar III</u>, 842 F.3d at 110 (1st Cir. 2016); <u>see also</u> <u>Grand Canyon Educ.</u>, 626 F. Supp. 3d at 451 ("[T]here are many reasons why the Government may refuse to withdraw Title IV funding even in light of Compensation Ban non-compliance.").  Accordingly, Plaintiff has sufficiently pled materiality.

### B.    Unjust Enrichment: Count III

In Count III, Plaintiff alleges that Defendants were unjustly enriched to the detriment of the Government.  Defendants claim that (i) Count III amounts to nothing more "than a restatement of the Government's FCA claims and must fail for the same reasons" and (ii) Plaintiff has failed to plead facts to support an inference that payments were made to the Government's unjust detriment.  [ECF No. 53 at 21–22].

> Unjust enrichment is an equitable remedy, which exist[s] to supplement those available at law and not to contradict the judgments embodied in the statutes and the common law.  Thus, a party with an adequate remedy at law cannot claim unjust enrichment.

Tomasella v. Nestlé USA, Inc., 962 F.3d 60, 82–83 (1st Cir. 2020) (alterations in original) (citations and internal quotation marks omitted).  Where an adequate remedy is available, "courts . . . dismiss unjust enrichment claims."  U.S. ex rel. Martino-Fleming v. S. Bay Mental Health Ctrs., 540 F. Supp. 3d 103, 133 (D. Mass. 2021) (citing A.J. Props., LLC v. Stanley Black & Decker, Inc., 972 F. Supp. 2d 68, 79–80 (D. Mass. 2013)).  Here, the FCA offers a cause of action for Defendants' purported wrongful conduct.  As such, because an adequate remedy at law is available to Plaintiff, Count III is DISMISSED.  U.S. v. Teva Pharms. USA, Inc., 560 F. Supp. 3d 412, 423–24 (D. Mass. 2021); see also Shaulis v. Nordstrom, Inc., 865 F.3d 1, 16 (1st Cir. 2017) ("Although [plaintiff] argues that, if her other claims are dismissed, she effectively has no adequate remedy, this argument misapprehends the relevant law.  It is the availability of a remedy at law, not the viability of that remedy, that prohibits a claim for unjust enrichment.").

IV.    **CONCLUSION**

For the reasons set forth above, Defendants' motion, [ECF No. 52], is **DENIED** in part and **GRANTED** in part.

**SO ORDERED.**

March 19, 2025                                                    */s/ Allison D. Burroughs*
                                                                          ALLISON D. BURROUGHS
                                                                          U.S. DISTRICT JUDGE